**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

RACHEL A. WEGELIN        :     CIVIL ACTION
                         :
     v.                   :
                         :
THE READING HOSPITAL AND    :     NO. 12-0386
MEDICAL CENTER             :

<u>MEMORANDUM OPINION</u>

Savage, J.                                 November 29, 2012

This action brought under the Family and Medical Leave Act ("FMLA")[1] presents the question whether a parent of a special needs child is entitled to FMLA leave to make suitable arrangements for the care of her child. We conclude that she is.

Plaintiff, Rachel Wegelin, contends that defendant, the Reading Hospital and Medical Center ("Reading Hospital"), violated the FMLA by refusing to grant her leave to find alternative daycare arrangements for her daughter, who suffers from pervasive developmental disorder ("PDD") and congenital blindness in one eye. Wegelin argues that due to a change in her job conditions, she needed time off work to arrange for a transfer of her daughter, who cannot be left unsupervised, to a different daycare that could accommodate the change in her work schedule.

Reading Hospital moved for summary judgment. It contends that Wegelin was not entitled to FMLA leave because her daughter did not suffer from a "serious health condition" and Wegelin was not "needed to care for" her daughter.

We denied summary judgment because there are genuine issues of fact regarding whether Wegelin's daughter, Carolyn, had a "serious health condition," as

---

[1] 29 U.S.C. §§ 2601 *et seq.*

defined in the FMLA and regulations promulgated under it, and whether Wegelin "needed to care for" her daughter when she had to make arrangements to transfer her to another daycare.  We now explain our rationale.

### Facts and Procedural Background

Wegelin was employed at the Reading Hospital as a technician assistant since 1997.  She was terminated on January 25, 2010, after she failed to report for duty.

In 2003, Wegelin gave birth to Carolyn, who suffers from PDD and congenital blindness in one eye.  PDD is an autism spectrum disorder, "characterized by impaired social interaction and communication, repetitive stereotyped patterns of behavior, and uneven intellectual development often with mental retardation."[2]  After Carolyn's birth, Wegelin returned to work full-time, Monday through Friday, from 8:30 a.m. to 5:00 p.m. She enrolled Carolyn in the Bowmansville Mennonite Church Before and After School Program.  The daycare's hours are 8:00 a.m. to 5:30 p.m.

Reading Hospital provides each employee a parking space in one of its garages or parking lots based on various criteria, including seniority, department location, and shift.[3]  Wegelin was assigned to the Spruce Street parking garage, which was within walking distance to her job location.  After she used a purloined parking pass to park at a parking garage that was closer to her department location, Wegelin was disciplined, resulting in the reassignment of her parking space to a remote parking lot, which required her to take a shuttle.  Due to the additional time needed to get to her car, she contends that she was unable to get to Bowmansville to pick up her daughter before the

---

[2] *Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J.*, at 1, Doc. No. 22.

[3] *Def.'s Mem. in Supp. of Mot. for Summ. J.*, at 2, Doc. No. 18.

daycare closed.  Thus, Wegelin needed to change Carolyn's daycare center to one that would be open until 6:00 p.m.

On January 18, 2010, Wegelin had a scheduled day off.  She did not report to work the rest of the week because she was looking for a daycare center that could take care of Carolyn with her special needs.  It is undisputed that she notified her supervisor that she needed time off to find a new daycare.  On January 21, 2010, Wegelin was told that she would be allowed to utilize her paid time off for the week of January 18 through 22, 2010, but she was expected to return to work on January 25, 2010.  When Wegelin did not report to work on January 25, Reading Hospital terminated her employment.

## Summary Judgment

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In examining the motion, we must draw all reasonable inferences in the nonmovant's favor.  *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159-60 (3d Cir. 2003).

The initial burden of demonstrating there are no genuine issues of material fact falls on the moving party.  Fed. R. Civ. P. 56(a).  Once the moving party has met its burden, the nonmoving party must counter with "'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and emphasis omitted).  Thus, "[w]here the record taken as a

whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted).

## Discussion

The FMLA is intended to balance the demands of the workplace with the needs of employees to take reasonable leave for eligible medical conditions and compelling family reasons.  29 U.S.C. § 2601(b)(1) and (2); *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 146 (3d Cir. 2004).  Congress enacted the FMLA in recognition of the growth of "single-parent households and two-parent households in which the single parent or both parents work," the importance of parental participation "in early childrearing" and "care of family members who have serious health conditions," the lack of "employment policies to accommodate working parents," and the inadequacy of "job security for employees who have serious health conditions."   29 U.S.C. § 2601; *Churchill v. Star Enters.*, 183 F.3d 184, 192 (3d Cir. 1999).

Under the FMLA, an eligible employee is entitled to a total of twelve workweeks of leave during any twelve month period "[i]n order to care for the spouse, or a son, daughter, or parent of the employee, if such spouse, son, daughter, or parent has a serious health condition."  29 U.S.C. § 2612(a)(1)(C).  After returning from an FMLA leave, the employee must be reinstated to his or her former position, or an equivalent one.  29 U.S.C. § 2614(a)(1).

An employer may not interfere with an employee's exercise of an FMLA right, nor may an employer discriminate against an employee for exercising or attempting to exercise this right.  29 U.S.C. §  2615.  "Interference" includes refusing to allow qualified FMLA leave.  29 C.F.R. § 825.220.  An employer is liable on an "interference" claim if

the employer denied FMLA leave that should have been allowed.  *See Sommer v. Vanguard Grp.*, 461 F.3d 397, 399 (3d Cir. 2006) (holding that the employee need only show that he was entitled to benefits under the FMLA and the employer denied such benefits); *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206-07 (11th Cir. 2001) (holding that "[t]o state a claim of interference with a substantive right, an employee need only demonstrate . . . that he was entitled to the benefit denied").  The FMLA prohibits employers from discharging an employee for exercising his or her rights under the FMLA.  29 U.S.C. § 2615; 29 C.F.R. § 825.220; *Sommer*, 461 F.3d at 399.

To prevail on an FMLA interference claim, Wegelin must prove that she was entitled to benefits under the FMLA, and that Reading Hospital denied her those benefits.  *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 401 (3d Cir. 2007) (citing *Callison v. City of Phila.*, 430 F.3d 117, 119 (3d Cir. 2005)).   To prove entitlement, Wegelin must prove the following elements: (1) Carolyn's health condition was a "serious health condition," as defined in the statute and the regulations promulgated under it; (2) Wegelin gave appropriate notice of her need to be absent from work; and (3) Reading Hospital interfered with her right to unpaid leave.  29 C.F.R. § 825.303; *Sarnowski*, 510 F.3d at 401-02.  The burden is on the plaintiff to prove the existence of an FMLA-eligible condition.  *Schaar v. Lehigh Valley Health Servs., Inc.*, 598 F.3d 156, 158 (3d Cir. 2010).

An employee is entitled to FMLA leave to care for a child who has a serious health condition.  29 U.S.C. § 2612(a)(1)(C).  A "serious health condition" is defined in the FMLA as an "illness, injury, impairment, or physical or mental condition" that

involves "inpatient care in a hospital, hospice, or residential medical care facility" or "continuing treatment by a health care provider."  29 U.S.C. § 2611(11).  This case does not concern inpatient care.  Rather, it presents a case where the parent of a child who is unable to perform regular life activities as a result of an impairment is entitled to FMLA leave in order to make appropriate arrangements for care of her special needs child.

The FMLA does not define what constitutes "continuing treatment" by a health care provider.  The statutory language narrowly defines "serious health condition."  But, the regulations amplify the definition, expanding it beyond the literal reading of the term.  The FMLA regulations describe conditions that constitute a qualifying "serious health condition."  29 C.F.R. § 825.115.  The definition includes "any period of incapacity" due to a "chronic serious health condition" or "a period of incapacity" which is "permanent or long-term due to a condition for which treatment may not be effective."  29 C.F.R. § 825.115(c) and (d).  "Incapacity" is defined as an "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor or recovery therefrom."  29 C.F.R. § 825.113(b).  A "chronic serious health condition" is "[a]ny period of incapacity" that (a) "[r]equires periodic visits . . . for treatment by a health care provider, or by a nurse under direct supervision of a health care provider;" (b) "[c]ontinues over an extended period of time;" and (c) may "cause episodic rather than a continuing period of incapacity (*e.g.*, asthma, diabetes, epilepsy, etc.)."  29 C.F.R. § 825.115(c).

In summary, relevant to this case, a "serious health condition" includes any period of incapacity (an inability to attend school or inability to perform other regular activities) due to a chronic condition, which has continued over an extended period of

time and requires "periodic visits" for treatment or evaluation with a doctor, nurse practitioner, or clinical social worker, or a nurse under the direct supervision of a doctor, nurse practitioner or clinical social worker.   29 C.F.R. §§ 825.113; 825.115; 825.125. Significantly, medical treatment need not have taken place immediately before or during the FMLA leave because "[a]bsences attributable to incapacity [due to a chronic serious health condition] . . . qualify for FMLA leave even though the employee or the covered family member does not receive treatment from a health care provider during the absence . . . ."  29 C.F.R. § 825.115(f).

In this case, Carolyn was born with pervasive developmental disorder, which is manifested by delays in social and emotional functioning, sensory integration difficulties, and attention deficit.[4]  She is blind in her left eye.  Due to her condition, she cannot be left unattended.  She requires constant supervision, both in school, daycare, and at home.

It is undisputed that Carolyn is never left unattended.[5]  Wegelin drops her off at the Bowmansville Mennonite Church Before and After School Program on the way to work.   The daycare transports Carolyn to and from the New Holland Elementary School.[6]   At school, she is in a full-time emotional support program under the

---

[4] *Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J.*, Ex. A, at 2.  In its Supplemental Memorandum, Reading Hospital contends that the only medical evidence Wegelin produced are reports from medical evaluations that took place between August 2010 and July 2011.  None of the reports specifically discuss Carolyn's health in January 2010, or whether she was unable to participate in her regular daily activities during that time.  But, they indicate that Carolyn was born with a disability and has been diagnosed with a developmental disorder.  Her condition remained constant throughout the period in question.  Carolyn's baseline condition is permanent incapacitation.

[5] Wegelin testified that her daughter could not be left alone at home and she "needed somebody at home."  Wegelin Dep. 155:15-24.  She also testified that, because of her special needs, her daughter "is not just someone [Wegelin] can let [] go anywhere."  Wegelin Dep. 154:5-7.

[6] *Def.'s Mem. in Supp. of Mot. for Summ. J.*, Ex. A, Wegelin Dep. 48:10-49:1.

supervision of teachers and a personal care assistant.  After school, she is returned to the daycare until her mother picks her up after work.

As Dr. Pamela Jordan, a licensed psychologist, found, Carolyn is extremely disruptive at school, and exhibits anxiety and "affective dysregulation when demands [a]re placed on her."[7]  She crawls on the floor and wraps her legs around a chair in effort not to comply.  She also throws items and books, and strikes adults who place demands on her.  Carolyn has twenty-to-thirty minute temper tantrums at home and at school, multiple times a day.  She often has to be removed from the classroom.  She also has difficulties with attention, executive functioning, and socializing.

Significantly in the context of this case, she becomes extremely anxious around people.  She has poor environmental and safety awareness.  Thus, a reasonable jury could find that she cannot be left alone.

As a result of her behavioral issues, Carolyn has not adjusted to the school environment.  In November 2009, for example, approximately two months prior to Wegelin's FMLA leave request, Carolyn was transferred to Brecknock Elementary School.  Because she exhibited significant attentional and executive functioning deficits, she could not remain in regular classes.  She was assigned a personal care assistant for sixty percent of her day.  As of February 2011, Carolyn was at the New Holland Elementary School in a full-time emotional support program under constant supervision.

Considering Carolyn's mental and emotional conditions, and her developmental history, a jury could find that she has a chronic serious health condition that causes an impairment.  It would then have to determine whether the impairment caused incapacity.

---

[7] *Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J.*, Ex. A, at 3.

The statute defines incapacity as the inability to attend school *or* perform other regular daily activities due to the serious health condition.   The FMLA and the regulations do not define "other daily activities."    The ADA definition of "major life activities," although not controlling, is informative.   29 C.F.R. § 1630.2(i); *Navarro v. Pfizer Corp.*, 261 F.3d 90, 97 (1st Cir. 2001).   Under the ADA, major life activities include, but are not limited to:

> Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working . . . .

29 C.F.R. § 1630.2(i).

Due to her condition, Carolyn is unable to perform many of these life activities. Although she attends school, she requires constant supervision and her behavior is unpredictable and disruptive.   She is blind in her left eye.   This condition causes her head to "abnormally turn or tilt to compensate for the eye muscle weakness."[8]   The psychological evaluation report analyzes various behaviors that demonstrate Carolyn's overall difficulty with integration and interaction with peers.   As a result of her disabilities, Carolyn requires constant care and she cannot attend school without significant disruption in daily activities, including extensive behavioral support and specialized attention.   Additionally, Carolyn's global assessment of functioning score indicates "severe impairment with daily life."[9]

---

[8] *Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J.*, Ex. A at 2.

[9] *Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J.*, at 4.   Reading Hospital relies upon a strict reading of the FMLA statute.   It contends that because Carolyn was able to attend school during Wegelin's FMLA leave, she was not incapacitated and did not have a serious health condition.   It cites *Perry v. Jaguar of Troy*, 353 F.3d 510 (6th Cir. 2010), for the proposition that supervision alone does not define a "serious health condition."   In *Perry*, the Sixth Circuit affirmed summary judgment where the employee had failed to present evidence that his son, who had various learning disabilities, suffered from

As a working parent, Wegelin was able to arrange for proper care of her daughter by enrolling her in the Bowmansville Church Before and After School daycare. Wegelin testified that she would drop off her daughter at daycare shortly before 8:00 a.m. and pick her up by 5:30 p.m. With her Spruce Street parking garage assignment, she had sufficient time to leave work to get to the daycare by that time.[10] In January 2010, her parking assignment changed to a different parking lot, resulting in her inability to arrive in time to pick up Carolyn at daycare. The new parking lot was not within walking distance from her department location. She had to take a shuttle.[11] As a result, "there was absolutely no way [she] would make it to that daycare at 5:30 p.m."[12] Wegelin notified her supervisor that she would have trouble reaching her daughter on time. Nonetheless, she was told that her work hours were strictly until 5:00 p.m.[13] Therefore, Carolyn's daycare arrangements, specifically her pick up time, had to be modified.

Although Wegelin's employment conditions changed, the Bowmansville daycare operating hours did not. The program started at 8:00 a.m. and ended "promptly at 5:30 p.m. and children not picked up by then [were] charged a late fee."[14] Wegelin testified

---

a serious health condition. The court held that the child must have been incapacitated, or unable to work, attend school, or perform other regular daily activities, during the period of his parent's leave. *Id.* at 515. It also noted that the amount of supervision a child needs does not address the child's ability to engage in regular daily activities. *Id.* at 516. Significantly, and in contrast to this case, Perry's child was able to attend school and engage in the same daily activities in which most children engage: riding the bus to and from school, riding bikes, swimming, playing video games, watching television, and playing with neighborhood friends.

[10] Wegelin Dep. 62:7-63:8.

[11] Wegelin Dep. 132:1-132:3.

[12] Wegelin Dep. 175:21-176:8; 218:20-219:3. The parties dispute whether Wegelin could still arrive at the daycare before closing.

[13] Wegelin Dep. 182:5-12; 184:3-25.

[14] *Def.'s Mem. in Supp. of Mot. for Summ. J.*, Ex. M.

that unless there were circumstances beyond her control, the daycare expected her to pick up Carolyn by 5:30 p.m.  Barring emergency situations, Wegelin had never been late.  She testified that although the daycare accommodated emergencies, it does not tolerate late pick-ups on a daily basis.[15]

In short, because Wegelin's new parking assignment delayed her departure from her work site, she was unable to get to Carolyn's daycare on time.  The daycare could not accommodate the time change.  As a result, Wegelin had to find a new daycare center that had hours that could meet her new work schedule.[16]

Wegelin started to look for a new daycare center promptly after learning of the new parking arrangement.  She testified that she attempted to find one that both could take care of a child with special needs and was open until at least 6:00 p.m.[17]

Wegelin did not have time to find a suitable daycare while she was at work.  She testified that her work schedule was Monday through Friday, 8:30 a.m. to 5:00 p.m.  She received a thirty-minute lunch and a short break in the morning and afternoon.  The breaks "were allowed if [employees] obviously had to use the restroom or to get a drink."[18]  Reading Hospital also did not permit employees to use cell phones in the

---

[15] Wegelin Dep. 51:11-52:18; 179:3-9.  "That is not something that they normally would want to happen.  If it's an emergency, they would understand.  But this isn't a daily – I cannot . . . pick my daughter up after 5:30 on a daily basis.  That is not something that they would allow."  Wegelin Dep. 178:4-13.

[16] Wegelin Dep. 152:1-152:8.  "I couldn't report back to work and have the same parking arrangements when I needed to find new care for my daughter.  My daughter could not remain at Bowmansville Mennonite Church because parking at [Vanity Fair parking lot], I would never be able to be there at 5:30 for her."  Wegelin Dep. 153:22-154:2.

[17] Wegelin Dep. 163:23-164:3.

[18] Wegelin Dep. 52:23-53:19.

11

hospital.[19]  Nor did it allow employees to make personal phone calls.[20]  In other words, there was no opportunity for her to make calls and visit daycare centers while she was working full-time.  Indeed, at Wegelin's deposition, when asked why she needed time off work to find a new daycare as opposed to using the phone, Wegelin testified that she had to find one who could care for her daughter's special needs.[21]

Wegelin unsuccessfully attempted to visit a daycare on the afternoon of January 18, her scheduled day off work.[22]  That daycare, however, did not bus to the Lancaster County School District, where Carolyn went to school.  Wegelin also made phone calls throughout that week to different locations.[23]  She called different daycares in the area, as well as schools and churches, in an attempt "to figure out who would be able to take care of [her] child."[24]  She also called Carolyn's school to ask if there was any other daycare "that could take care of her with bus service to and from their school."[25] Wegelin learned that Bowmansville was the only center that bused to and from Carolyn's school.  Wegelin then started calling area churches "to find out if there was

---

[19] Wegelin Dep. 212:14-18.

[20] Wegelin Dep. 213:19-214:2.

[21] "Because . . . my daughter is just not someone I can just let her go anywhere.  She has special needs.  I need to look into particular places.  I don't have much time at work. . . . I have a half hour lunch." Wegelin Dep. 154:5-10.

[22] Wegelin Dep. 163:2-8.  She testified that she could not visit many places during her scheduled day off because she had her daughter with her and she did not "believe that's a time to be running . . . all over the place."  Wegelin Dep. 154:11-16.

[23] Wegelin Dep. 154:20-25.

[24] Wegelin Dep. 167:22-168:2.

[25] Wegelin Dep. 169:8-17.

anyone that was able to take care [of] a child with special needs."[26]  She hoped to find

one that provided transportation.

According to Wegelin, she called about six locations to find an alternative

arrangement for Carolyn's daycare.  She was waiting to hear back from some of them

because they had to check with others "who would be able to provide the care."[27]

Wegelin summarized her predicament at her deposition:

> I was either calling on the phone, the places that I did know of, or trying to
> figure out where my daughter could be placed.  She can't be left alone at
> home.  I'm being forced to basically be put in a situation here that – I feel I
> had a compelling and it's – that's just nature to do what I did here.  I
> couldn't report back to work.  I let the hospital know.  I asked for the time.
> And they didn't grant it for me.  My daughter needed somebody at home.
> And I was the only one there.[28]

Wegelin needed time to find a daycare center that could handle her child's

impairments and would accept the responsibility.  Reading Hospital refused to grant her

such time.

Reading Hospital contends that Wegelin's attempts to find alternative daycare

arrangements do not constitute a "need to care for" Carolyn due to her medical

condition.  As the language of the statute and the regulations make clear, FMLA does

not provide qualified leave to cover every family emergency.  FMLA leave is only

available when an employee is "needed to care for" a family member.  29 U.S.C. §

---

[26] Wegelin Dep. 170:4-15.

[27] Wegelin Dep. 174:6-21.  At her deposition, Wegelin was asked why she did not contact any
parent at the daycare to find out if they could watch Carolyn for the additional ten to fifteen minutes.
Wegelin responded that she was in contact with others "to try to find someone that was qualified," but she
did not ask any parents at Carolyn's daycare because Carolyn is a child with special needs and she did
not feel comfortable "just leaving her with anyone without knowing them."  Wegelin Dep. 179:17-180:14.

[28] Wegelin Dep. 155:12-24.

2612(a)(1)(C).  Although the FMLA does not define the phrase, the regulations describe it as follows:

> [Whether an employee is "needed to care for" a family member] encompasses both physical and psychological care.  It includes situations where, for example, because of a serious health condition, the family member is unable to care for his or her own basic medical, hygienic, or nutritional needs or safety  . . . .  The term also includes providing psychological comfort and reassurance which would be beneficial to a child, spouse or parent with a serious health condition who is receiving inpatient or home care . . . .  The term also includes situations where the employee may be needed to substitute for others who normally care for the family member . . . or *to make arrangements for changes in care*, such as transfer to a nursing home.

29 C.F.R. § 825.124 (emphasis added).

Reading Hospital argues that Wegelin's sole criterion for a change in daycare was finding a daycare that would be open after 5:30 p.m.  It contends she has failed to demonstrate a nexus between Carolyn's health condition and the need to find an alternative daycare.  However, Wegelin testified that she was trying to find a daycare that would be qualified to care for Carolyn and her special needs as well as one that could meet her work schedule.

Making arrangements for "changes in care" is expressly covered by the regulations.  Significantly, the regulations are silent on whether the facility needs to be one that provides medical treatment.   The fact that Carolyn's daycare is not a specialized facility is not dispositive.  What is relevant is that Carolyn has a chronic serious health condition resulting in an inability to perform regular daily activities and Wegelin had to make arrangements to find a suitable daycare that could care for her. Bowmansville daycare center was suitable, but no longer available.  Therefore, when Reading Hospital changed Wegelin's parking assignment, she had to make arrangements for a change in Carolyn's care, entitling Wegelin to FMLA leave.

**Conclusion**

Based on Wegelin's testimony and the medical evidence documenting Carolyn's symptoms, there are genuine issues of fact relating to Carolyn's incapacity and Wegelin's need to care for her by finding a suitable daycare provider that preclude summary judgment.  *See, e.g., Rankin v. Seagate Techs., Inc.*, 246 F.3d 1145, 1148-1149 (8th Cir. 2001) (plaintiff's affidavit testimony that she was "too sick to work" combined with medical records showing she suffered from the same symptoms were sufficient to create a genuine issue of material fact regarding plaintiff's incapacity); *Marchisheck v. San Mateo Cnty.*, 199 F.3d 1068, 1074 (9th Cir. 1999) (holding that a plaintiff's declaration that "I just did not and could not do anything for four or five days" creates "a disputed issued of fact and precludes summary judgment on the issue of 'incapacity.'"), *cert. denied*, 530 U.S. 1214 (2000).   Therefore, Reading Hospital's motion for summary judgment was denied.